## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-mj-218 (ZMF) |
| WILLIAM CHRESTMAN, | Chief Judge Beryl A. Howell |
| Defendant. | |

## **MEMORANDUM OPINION**

Defendant William Chrestman, along with at least four co-conspirators, enthusiastically participated in the storming of the U.S. Capitol on January 6, 2021, with videoclips showing him brandishing an axe handle and donning tactical gear to confront, threaten, and impede the police and to encourage the mob in its assault on the constitutional ritual of confirming the results of the 2020 Presidential Election. As a result of this conduct, he has been charged in a six-count criminal complaint with five felony offenses and one Class B misdemeanor offense. *See* Crim. Compl. ("Compl.") at 2, ECF No. 2-2. The government seeks review of a magistrate judge's order releasing defendant pending trial on these charges. Gov't's Mot. for Emergency Stay and for Review of Release Order ("Gov't's Mot."), ECF No. 7.

Following a hearing held on February 23, 2021, the government's motion was granted, and defendant was ordered detained pending trial. Min. Entry (Feb. 23, 2021). Set out below are the written findings and reasons underlying this order. *See* 18 U.S.C. § 3142(i)(1) (requiring that a detention order "include written findings of fact and a written statement of the reasons for the detention"); *United States v. Nwokoro*, 651 F.3d 108, 112 (D.C. Cir. 2011) (remanding to the district court for a preparation of "findings of fact and a statement of reasons in support of [defendant's] pretrial detention" when a transcription of the detention hearing was insufficient).

1

## I. BACKGROUND

Defendant is charged in a criminal complaint with five felony counts: (1) Conspiracy to Commit An Offense Against the United States, specifically, to obstruct law enforcement on the Capitol grounds and inside the Capitol building and to obstruct certification of the vote count of the Electoral College of the 2020 Presidential Election, along with at least four co-conspirators, in violation of 18 U.S.C. § 371; (2) Obstructing, Impeding, or Interfering with a Law Enforcement Officer Lawfully Engaged in the Performance of His Official Duties, Incident to the Commission of a Civil Disorder that Adversely Affects the Performance of Any Federally Protected Function, in violation of 18 U.S.C. § 231(a)(3); (3) Obstruction of an Official Proceeding (the joint session of Congress convened to certify the Electoral College vote), in violation of 18 U.S.C. § 1512(c)(2); (4) Threatening to Assault a Federal Law Enforcement Officer, in violation of 18 U.S.C. § 115(a)(1)(B); and (5) Knowingly Entering or Remaining in Any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. §§ 1752(a)(1) and (2), with a felony enhancement for carrying a dangerous weapon under § 1752(b)(1)(A). Compl. at 2. He is also charged in an additional count with the Class B misdemeanor offense of Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. §§ 5104(e)(2)(D) and (G). *Id.* The government's evidence of the conduct underlying these charges and proffer in support of pretrial detention is described below, followed by a brief overview of the procedural history.

### A. Defendant's Conduct on January 6, 2021

The government proffers that, two months after the November 3, 2020 presidential election, on January 6, 2021, a joint session of the United States Congress convened at the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election. Compl., Aff. Supp. Crim. Compl. & Arrest Warrant ("Aff.") ¶ 7, ECF No. 2-3. The joint session

began at approximately 1:00 p.m., with then–Vice President Mike Pence presiding.  *Id.*  By 1:30

p.m., the United States House of Representatives and the United States Senate adjourned to

separate chambers within the Capitol to resolve an objection raised in the joint session.  *Id.*  Vice

President Pence continued to preside in the Senate chamber.  *Id.*  As the House and Senate

proceedings took place, a large crowd of protestors gathered outside the Capitol.  *Id.* ¶ 8.

"[T]emporary and permanent barricades were in place around the exterior of the . . . building,

and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol

building and the proceedings underway inside."  *Id.*

Shortly after 2:00 p.m., a violent mob of rioters "forced entry" into the Capitol, Aff. ¶ 9,

and mayhem broke out inside the building, putting an hours-long halt to the electoral vote count

while elected representatives, congressional staff, and members of the press hid in terror from the

mob, *id.* ¶¶ 9–10.  The joint session, and thus the constitutional ritual of confirming the results of

the 2020 Presidential Election, "was effectively suspended until shortly after 8:00 p.m."  *Id.* ¶ 10.

Defendant is a known member of the Kansas City chapter of the Proud Boys, Rough

Transcript of Hearing (Feb. 23, 2021) ("Hr'g Tr. (Rough)") at 14:1-25,[1] a gang that "describes

itself as a 'pro-Western fraternal organization for men who refuse to apologize for creating the

modern world; aka Western Chauvinists,'" and whose members "routinely attend rallies,

protests, and other First Amendment–protected events, where they sometimes engage in violence

against individuals whom they perceive as threats to their values," Aff. ¶ 19.  In the weeks

leading up to January 6, 2021, the Proud Boys' public communications encouraged members to

---

[1]        Citations to the February 23, 2021 hearing transcript are to a rough draft of the transcript, since no final
transcript is available.  When finalized, the transcript will be posted on this case's docket.  Discrepancies in page
numbers between the rough and final transcripts may exist.

3

travel to Washington, D.C. to attend the demonstration against the certification of the Electoral College vote. *Id.* ¶¶ 20–21.

Defendant accepted this invitation and traveled from his home in Kansas all the way to Washington, D.C. to take part in the assault on both the Capitol and the peaceful transition of power. Gov't's Mot. at 4. Photo and video evidence shows defendant on the afternoon of January 6, 2021, shortly before the 1:00 p.m. start of the joint session, standing among and speaking with a large group of Proud Boys near the Capitol, Aff. ¶¶ 22–23, and then marching with the Proud Boys towards the pedestrian entrance to the Capitol grounds, which was guarded by Capitol Police, *id.* ¶¶ 24, 26. In the photos and video footage, defendant is wearing "a black baseball hat, black framed glasses, a black sweatshirt, black boots, tan gloves, green and tan camouflage pants, and a green tactical vest." *Id.* ¶ 14. He was carrying a long wooden stick, which was initially wrapped in a blue flag, that the government believes to be an axe handle, and a hard, black helmet marked with a piece of orange tape. *Id.* ¶¶ 14, 26; Hr'g Tr. (Rough) at 10:20-25.

Video footage and photographs next show defendant and his co-conspirators, each of whom had headgear marked with orange tape similar to that seen on defendant's black helmet, moving to the front of the crowd nearing the Capitol grounds in order to confront the Capitol Police. Aff. ¶ 26. As the mob advanced towards the Capitol building, knocking down metal police barriers in their path, *id.* ¶ 27, defendant stood directly in front of Capitol Police officers attempting to guard the building, *id.* ¶ 28. He yelled at them, "You shoot and I'll take your fucking ass out!" *Id.* When Capitol Police tried to arrest a member of the crowd, defendant encouraged others to stop the police, saying, among other things, "Don't let them take him!" *Id.*

As the crowd pressed further still towards the Capitol, overwhelming successive police lines, defendant switched headgear and put on his black helmet, marked with orange tape, and removed the blue flag from his weapon. *Id.* ¶ 29.  He soon traded in his helmet for a gas mask. *Id.* ¶ 30; Hr'g Tr. (Rough) at 11:6-17.  Wearing the gas mask, he turned to address the crowd, shouting "Whose house is this?" and "Do you want your house back?"  Aff. ¶ 31.  He then told the crowd to "Take it!"  *Id.*  This speech is captured on video.  *Id.*

While still outside the Capitol, defendant and his co-conspirators toppled the metal barriers used by Capitol Police to control the crowd.  *Id.* ¶ 32.  They subsequently breached the building.  *Id.* ¶ 33.  Law enforcement attempted to lower metal barriers in the tunnels underneath the Capitol to seal off areas inside the building from the mob.  *Id.* ¶ 34.  Defendant led his co-conspirators in deliberate efforts to prevent Capitol Police from closing the barriers.  He can be seen in surveillance footage using his axe handle to obstruct one of the barriers, while all but one of his co-conspirators are seen using their arms, a chair, and a podium to keep other barriers from closing.  *Id.* ¶¶ 34–39.

### B.    Arrest of Defendant and Search of His Home

In the aftermath of the events of January 6, defendant quickly became aware that he was under investigation and that he might face criminal charges related to his conduct at the Capitol. On January 24, 2021, the *Kansas City Star* reached out to him about his role in the Capitol riot. Def.'s Detention Mem. ("Def.'s Mem.") at 1–2, *United States v. Chrestman*, Case No. 21-mj-8023 (D. Kan. Feb. 16, 2021), ECF No. 7.  A February 4, 2021 article in the *Star* reported that "multiple sources had identified [defendant] as a participant in the riot, and had so notified the FBI."  *Id.* at 2.  Defendant contacted counsel, and did not attempt to flee, but he did not voluntarily surrender.  *Id.*  Nor does the record suggest that he made any effort to distance himself from the Proud Boys after January 6, 2021.

5

On February 11, 2021, federal law enforcement officers arrested defendant and executed a search warrant at his home in Kansas.  Gov't Mot. at 2, 17.  The government proffers, based on notable gaps in the evidence recovered during the search, that defendant may have concealed or discarded evidence between January 6 and his arrest on February 11.  *Id.* at 17.  For example, law enforcement officers discovered defendant's cell phone hidden in a dresser drawer in the bedroom of his six-year-old child.  *Id.*  They did not recover any camouflage clothing or tactical gear, such as the black helmet marked with orange tape or the gas mask, that defendant was seen wearing on January 6, nor the axe handle.  *Id.*  Though defendant is known to own multiple firearms, officers found only a single handgun in a vehicle parked outside the house, Hr'g Tr. (Rough) at 22:20–23:4, and did not locate a particular rifle marked with a distinctive Proud Boys acronym that is on display in several of defendant's social media posts, *id.* at 12:20–13:5, 23:5-7; Gov't Mot. at 17–18.  One of defendant's co-conspirators informed law enforcement that defendant had asked this co-conspirator to hold his firearms after returning to Kansas from Washington, D.C.  Gov't Mot. at 18.

## C.    Procedural Background

Upon defendant's arrest on February 11, 2021 at his Kansas home, the government moved for detention pending trial, Gov't Mot. Pretrial Detention, *Chrestman*, Case No. 21-mj-8023 (D. Kan. Feb. 12, 2021), ECF No. 1, and a detention hearing was scheduled for February 17, 2021 before a magistrate judge in the District of Kansas.  Two days after the hearing, on February 19, 2021, the government's motion for pretrial detention was denied and defendant was ordered to be released to home incarceration with electronic monitoring.  *United States v. Chrestman*, Case No. 21-mj-8023, 2021 WL 663189, at *9 (D. Kan. Feb. 19, 2021).  The government filed motions to stay release and for review and appeal of the release order, *see* Gov't Mot., and for an order to transport defendant from the District of Kansas to the District

6

of Columbia, *see* Gov't's Mot. for Transport Order, ECF No. 8. The motion to stay release was

granted. *See* Order, ECF No. 9. The motion for a transport order was denied. *See* Min. Order

(Feb. 21, 2021).[2] A hearing on the government's motion for review and appeal of the release

order was scheduled for and held on February 23, 2021, with defendant participating remotely

from the District of Kansas, *see id.*; Min. Entry (Feb. 23, 2021).

## II. LEGAL STANDARD

### A. Pretrial Detention Under the Bail Reform Act

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited

pretrial detention of persons who are presumed innocent to a subset of defendants charged with

crimes that are 'the most serious' compared to other federal offenses." *United States v.

Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747

(1987)). Thus, a detention hearing must be held at the government's request only "in a case that

involves" a charged offense falling in one of five enumerated categories, 18 U.S.C.

§ 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct

justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B).[3] As generally

pertinent to charged offenses arising out of the January 6, 2021 assault on the Capitol, a

detention hearing must be held on the government's motion when the charged offense involves:

1. "[A] crime of violence," *id.* § 3142(f)(1)(A), which is defined broadly as an offense
   having as an element the attempted, threatened, or actual use of physical force against a
   person or property of another, or a felony offense that, by its nature, involves a

---

[2]     Under normal circumstances, defendants charged in but arrested outside this District are transported to
Washington, D.C., as the location of "the court having original jurisdiction over the offense,"18 U.S.C. § 3145(a),
(b), for further in-person proceedings. Given delays in transport due to the COVID-19 pandemic, and the
availability of remote proceedings, within weeks of the January 6, 2021 events, the normal practice of transporting
such defendants to this District was modified to hold prompt hearings remotely, without transfer of the defendant, on
motions by the government or the defendant for revocation or amendment of a magistrate judge's order.
[3]     In cases involving a serious risk of flight or obstruction of justice, a detention hearing "shall" be held "upon
motion of the attorney for the Government or upon the judicial officer's own motion." 18 U.S.C. § 3142(f)(2).

substantial risk that physical force against the person or property of another may be used in the course of committing the offense, *id.* § 3156(a)(4)(A)–(B);

2. "[A]n offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed," *id.* § 3142(f)(1)(A), which "list" includes "a violation of . . . [18 U.S.C. §] 1361 (relating to government property or contracts)," *id.* § 2332b(g)(5)(B)(i);[4]

3. "[A]ny felony that is not otherwise a crime of violence that involves . . . the possession or use of a firearm or destructive device . . . or any other dangerous weapon[,]" *id.* § 3142(f)(1)(E);

4. "[A] serious risk that such person will flee," *id.* § 3142(f)(2)(A); or

5. "[A] serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror," *id.* § 3142(f)(2)(B).

A subset of the types of offenses requiring a detention hearing triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" that subset of offenses. *Id.* § 3142(e)(3). As pertinent to charged offenses arising out of the January 6, 2021 assault on the Capitol, that subset of offenses includes "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." *Id.* § 3142(e)(3)(C).

The BRA provides that a judicial officer "shall order" the "detention of the [defendant] before trial," if, after a detention hearing held under 18 U.S.C. § 3142(f), and upon consideration

[4]    18 U.S.C. § 2332b(g)(5) provides a definition for "the term 'Federal crime of terrorism,'" when the offense is "a violation of" an enumerated list of Federal offenses set out in § 2332b(g)(5)(i)–(iv) *and* the offense "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *id.* § 2332b(g)(5)(A). While individuals involved in the January 6, 2021 assault on the Capitol expressed publicly the intent to disrupt a government function in certifying the results of the 2020 Presidential Election and to coerce such disruption by breaching the Capitol, to date, to the knowledge of this Judge, no person charged in connection with the assault on the Capitol has been charged with a "Federal crime of terrorism," under chapter 113B of title 18, United States Code, but only with separate, predicate enumerated offenses, such as violation of 18 U.S.C. § 1361 (relating to government property or contracts).

8

of "the available information concerning" enumerated factors, *id.* § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *id.* § 3142(e)(1). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). The BRA "requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *Salerno*, 481 U.S. at 755.

In assessing whether pretrial detention or release is warranted, the judicial officer must "take into account the available information concerning" the following four factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam).

### B.    Review of a Magistrate Judge's Pretrial Release Order

If a defendant is ordered released under § 3142 by a judicial officer, including "by a magistrate judge," the BRA allows the government to "file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the

conditions of release," which motion must be resolved "promptly." 18 U.S.C. § 3145(a); *see also id.* § 3145(b) (providing the same right of review to a defendant who is ordered detained by a magistrate judge or other judicial officer). Neither § 3142 nor § 3145 specifies the standard of review to be applied by a district court reviewing a magistrate judge's release or detention order, and "the D.C. Circuit has not yet addressed the issue." *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017). Nonetheless, both the BRA and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order *de novo*.[5] This conclusion is confirmed by review of the relevant statutes.

First, the BRA vests the authority to review and ultimately to "determine[]" a motion for review of a pretrial release or detention order in a "judge of a court having original jurisdiction over the offense." 18 U.S.C. § 3145. Even when reviewing an order issued under § 3142, then, the district court exercises its original jurisdiction over the case as a whole, not appellate jurisdiction over the magistrate judge's release or detention order. *See, e.g.*, *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990) ("'Because the district court was the court having original jurisdiction of the felonies charged, the district judge was not exercising an appellate

---

[5]     For Court of Appeals decisions uniformly endorsing a *de novo* standard of review, see *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003) ("The standard of review for the district court's review of a magistrate judge's detention or release order under § 3145(a) is *de novo*."); *United States v. Kirkaldy*, 181 F.3d 83 tbl. (2d Cir. 1999) ("On a motion for revocation or amendment of the detention order, a district court should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." (internal quotation marks and citation omitted)); *United States v. Rueben*, 974 F.2d 580, 585–86 (5th Cir. 1992) ("When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions for release."); *United States v. Tortora*, 922 F.2d 880, 883 n.4 (1st Cir. 1990) ("We believe that the proper approach is for the district court to engage in de novo review of the contested order."); *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990) (collecting cases and holding that the district court should conduct a *de novo* review of the magistrate judge's detention decision); *United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989) ("A defendant ordered detained by a magistrate may seek de novo review in the district court."); *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc) (stating that district court's review of magistrate judge's order setting bond was de novo); *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985) (holding that district court did not err in reviewing *de novo* a magistrate judge's detention decision).

jurisdiction[.]'" (quoting *United States v. Thibodeaux*, 663 F.2d 520, 522 (5th Cir. 1981))).

Moreover, § 3145(a) and (b) explicitly provide for the filing of a "motion" to revoke or amend the magistrate judge's order. 18 U.S.C. § 3145(a), (b). In contrast, § 3145(c), the BRA's provision for review of a district court's release or detention order by a court of appeals, references the filing of an "appeal" to be governed by 28 U.S.C. § 1291 and 18 U.S.C. § 3731. This deliberate choice by Congress to style review of magistrate judge decisions as "motions" rather than "appeals" indicates that the district court's review occupies a procedural posture more similar to a motion for reconsideration of its own decision, at which stage both factual and legal findings are open to revision, than to appellate review, at which stage deference to factual findings is appropriate. Thus, the BRA "'confer[s] a responsibility on the district court to reconsider the conditions of release fixed by another judicial officer . . . as unfettered as it would be if the district court were considering whether to amend its own action,'" *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc) (quoting *Thibodeaux*, 663 F.2d at 522), a responsibility that can be satisfied only through *de novo* review.

This conclusion is further bolstered by the Federal Magistrates Act, which confers upon magistrate judges "the power to . . . issue orders pursuant to [the BRA] concerning release or detention of persons pending trial." 28 U.S.C. § 636(a)(2). Like the BRA, the Federal Magistrates Act is silent as to the appropriate standard for review of magistrate judge orders under § 3142. Elsewhere, however, the statute expressly provides that a district court may reconsider a magistrate judge's order regarding nondispositive pretrial matters only where the order "is clearly erroneous or contrary to law." *Id.* § 636(b)(1)(A). This provision shows that Congress knew how to require more deferential review of magistrate judges' orders, and chose to omit similar language from § 636(a)(2)'s authorization of BRA decisions, implying that a

different standard of review applies in the BRA context. Viewed in light of the principle that a magistrate judge's actions "take[] place under the district court's total control and jurisdiction," *United States v. Raddatz*, 447 U.S. 667, 681 (1980), the absence of a statutory mandate for deferential review of pretrial release and detention orders in the Federal Magistrates Act lends further support to the premise that, as clearly indicated by the text and structure of the BRA, Congress intended for review under § 3145 to be conducted *de novo*.

In short, both the BRA and the Federal Magistrates Act lead to the conclusion that a district court reviews a magistrate judge's pretrial release or detention order *de novo*. Unsurprisingly, this view is shared by every circuit court to have addressed the standard of review under § 3145, *see supra* note 5, and by the Local Rules of this Court, *see* Local Crim. R. 59.3(b) (providing for "de novo review by the Chief Judge" of any order issued by a magistrate judge in an unassigned criminal case, including pretrial detention or release orders). A reviewing district court therefore undertakes the analysis outlined in § 3142, described *supra* Part II.A, without any deference to the magistrate judge's findings.

## III. DISCUSSION

The government contends that pretrial detention is warranted because defendant is charged with felonies involving the use of a "dangerous weapon" (the axe handle), triggering a pretrial detention hearing pursuant to 18 U.S.C. § 3142(f)(1)(E), and presenting, in the larger context of the offense conduct, a danger to the community. Gov't Mot. at 20 (citing 18 U.S.C. § 3142(f)(1)(E)). The government further argues that defendant poses both a flight risk and a serious risk that he will obstruct or attempt to obstruct justice. *Id.* (citing 18 U.S.C. §§ 3142(f)(2)(A), (B)).[6] In considering the requisite § 3142(g) factors, the Court concludes that

---

[6]     At the February 23, 2021 detention hearing, the government conceded that flight risk is "not . . . the strongest case on which [it] rel[ies]" in arguing for pretrial detention. Rather, the government "specifically [is]

12

the government has demonstrated, by clear and convincing evidence, that "no condition or combination of conditions will reasonably assure" the safety of the community, 18 U.S.C. § 3142(e)(1), and therefore orders that the defendant be detained pending trial. The statutory factors are discussed *seriatim*.

### A.        The Nature and Circumstances of the Offense

The first statutory factor requires the Court to consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1). Central to the circumstances of defendant's instant offenses is the fact that he was one of hundreds, if not thousands, of individuals who comprised the mob that assaulted the Capitol on January 6, 2021. Many of these individuals have already been charged with criminal offenses or soon will face criminal charges related to their conduct on that day. The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.

Nonetheless, not all of the rioters charged with offenses stemming from the January 6 attack will be held pending trial.[7] Nor has this Court uniformly granted the government's requests for pretrial detention. *See, e.g.*, Min. Entry (Feb. 11, 2021), *United States v. Powell*, No. 21-mj-197-GMH-1 (D.D.C. Feb. 11, 2021) (denying the government's motion to review and reverse a magistrate judge's order releasing defendant pending trial); Min. Entry (Feb. 5, 2021), *United States v. Griffin*, No. 21-cr-92-TNM-1 (D.D.C. Feb. 5, 2021) (same). The BRA, of course, requires a reviewing court to assess the specific conduct of each defendant, but the

---

relying on the defendant's obstructive conduct and his risk of further obstruction in this case [and] also, his danger to the community[.]" Hr'g Tr. (Rough) at 20:12-16.

[7]        Indeed, the government has not sought pretrial detention for numerous defendants, including some charged with serious felony offenses. *See, e.g.*, Min. Entry (Jan. 15, 2021), *United States v. DeCarlo*, No. 21-cr-73 (BAH) (D.D.C. Jan. 15, 2021) (noting that the "[g]overnment does not seek . . . pretrial detention" of defendants charged with conspiracy against the United States, in violation of 18 U.S.C. §§ 371 and 1512(c)(2)).

varying results in these cases raise the natural question, given the undeniably traumatic events of January 6, of the standard against which a particular defendant's actions on that day should be evaluated. Before evaluating the nature and circumstances of defendant's specific conduct, then, consideration of the differentiating factors that warrant pretrial detention of certain defendants facing criminal liability for their participation in the mob and pretrial release of others is helpful.

### 1. *Considerations Relevant to the Nature and Circumstances of Offenses Committed at the U.S. Capitol on January 6, 2021*

In the course of this Court's consideration of motions for the pretrial release or detention of a number of defendants charged in relation to the events of January 6, several offense characteristics have emerged as guideposts in assessing, under § 3142(g)(1), the comparative culpability of a given defendant in relation to fellow rioters. The first differentiating factor, evident on the face of a criminal complaint, information, or indictment, is whether a defendant has been charged with felony or misdemeanor offenses. Felony charges are by definition more serious than misdemeanor charges; the nature of a felony offense is therefore substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense.

Beyond this initial inquiry, the details of the charged conduct inform assessment of the nature and circumstances of the offense. The overarching goal of the § 3142(g) analysis—to ensure that the pretrial release of a defendant will not imperil "the safety of any other person and the community"—and § 3142(g)(1)'s mandate that judges consider certain offense characteristics that might be probative of danger to the community suggest that a reviewing court should give weight to any particulars of the offense that indicate the defendant continues to pose a threat to public safety. 18 U.S.C. § 3142(g); *see also id.* § 3142(g)(1) (requiring that the reviewing court consider "whether the offense is a crime of violence, . . . a Federal crime of terrorism, or involves . . . a controlled substance, firearm, explosive, or destructive device"). Thus, a number

of considerations implicating the dangerousness inherent in a defendant's conduct on January 6 are relevant.

Two of these factors examine the defendant's conduct before January 6 in furtherance of the offenses charged. First, any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear, suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process, mandated under the U.S. Constitution, of counting and certifying Electoral College votes. *See* U.S. Const. art. II, § 1, cl. 3. Likewise, a defendant's carrying or use during the riot of a dangerous weapon, whether a firearm, a large pipe, a wooden club, an axe handle, or other offensive-use implement, indicates at least some degree of preparation for the attack and an expectation that the need to engage in violence against law enforcement or, indeed, the Legislative branch, might arise. These motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole.

The next two factors scrutinize a defendant's role in relation to other rioters. Evidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol. Similarly, a defendant who assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct, for example, by urging rioters to advance on the Capitol or to confront law enforcement, may have inspired further criminal conduct on the part of others.

The presence of either of these factors enhances the defendant's responsibility for the destabilizing events of January 6 and thus the seriousness of his conduct.

In addition, a defendant's words and movements during the riot reflect the egregiousness of his conduct. A defendant who remained only on the grounds surrounding the Capitol exhibited less brazen disregard for restrictions on unlawful entrants than did a defendant who breached the interior of the Capitol building. The conduct of a defendant who injured, attempted to injure, or threatened to injure others, or who damaged or attempted to damage federal property, is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises. Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

Taken together, as applied to a given defendant, these considerations are probative of "the nature and circumstances of the offense charged," 18 U.S.C. § 3142(g)(1), and, in turn, of the danger posed by the defendant, as explained *infra* Part III.D. Of course, individualized evaluation of each case may generate additional relevant offense characteristics or merit the conclusion that some of the considerations enumerated here are inapplicable or unpersuasive, and, of course, this is just one of the § 3142(g) factors. As a starting point, however, the factors described above offer a useful framework through which to contextualize the nature and

16

circumstances of offenses committed at the U.S. Capitol on January 6, 2021. The comparative severity of defendant's alleged conduct is assessed against this backdrop.

### 2. *The Nature and Circumstances of Defendant's Offenses*

Consideration of every one of the factors outlined above demonstrates the gravity of defendant's offenses in the instant case. The factual proffer by the government is that defendant traveled from his home in Kansas to the nation's capital, prepared with an axe handle, a helmet, a gas mask, and tactical gear, to participate in a demonstration on January 6, 2021. On that day, he assembled with other members of the Proud Boys, including some of his co-conspirators, and marched with them on the Capitol grounds. He, along with his co-conspirators, pushed to the front of the crowd, toppling police barriers and overwhelming police lines as they advanced. Standing directly in front of a group of Capitol Police, defendant threatened the police, shouting "You shoot and I'll take your fucking ass out!" As he moved closer to the Capitol, defendant donned first his helmet and then his gas mask, and revealed his axe handle, ready for a violent confrontation. When his group finally breached the Capitol, defendant guided his co-conspirators' efforts to obstruct the metal barriers being lowered by law enforcement to prevent unlawful entry into the tunnels underneath the Capitol. He personally obstructed one barrier with his axe handle. Throughout these events, defendant appeared to act as a leader not only of his co-conspirators, but also of the gathering mob, encouraging them to "take" the Capitol and to interfere with Capitol Police as they attempted to arrest one individual. *See generally supra* Part I.A.

As a result of this conduct, defendant is charged with five serious felony offenses, outlined above, as well as a misdemeanor offense. One of the felony charges he faces, of Threatening to Assault a Federal Law Enforcement Officer in violation of 18 U.S.C. § 115(a)(1)(B), poses an inherent risk of danger to the community as a "crime of violence"

within the meaning of § 3142(g).  *See* 18 U.S.C. § 3142(g)(1); *id.* § 3156(a)(4) (defining a

"crime of violence" under the BRA as "an offense that has an element of the offense the use,

attempted use, or threatened use of physical force against the person or property of another");

*United States v. Kaetz*, No. 2:20-CR-1090-1, 2021 WL 37925, at *4 (D.N.J. Jan. 4, 2021)

(treating a charge under 18 U.S.C. § 115(a)(1)(B) as a "crime of violence" under § 3142(g)(1)).

      The remaining felony charges are not crimes of violence, but defendant's underlying

conduct clearly demonstrates a risk of danger to the community.  Defendant was not just an

enthusiastic participant in the Capitol riot.  He came to Washington, D.C. ready for a fight,

armed with tactical gear and a weapon; coordinated with his fellow Proud Boys and others

before and during the assault on the Capitol; and led his co-conspirators through the Capitol

grounds and into the building, shouting at the crowd to "take" the Capitol.  This defendant's

actions were specifically designed to impede law enforcement.  He confronted the Capitol Police

at every opportunity, threatened them, and encouraged the mob to stop them from carrying out

their duties.  Finally, he deployed his axe handle and directed his co-conspirators in a scheme to

prevent Capitol Police from securing areas of the Capitol with metal barriers.  In short, he sought

and succeeded in creating mayhem on Capitol grounds and interfering with the Capitol Police,

all in furtherance of the goal of disrupting Congress's fulfillment of its constitutional duty to

certify the vote count of the Electoral College and thus interfering with—or even preventing—

the peaceful transition of power.  The nature and circumstances of defendant's offenses evince a

clear disregard for the law, concerted and deliberate efforts to undermine law enforcement, and

an apparent willingness to take coordinated, pre-planned, and egregious actions to achieve his

unlawful aims, all of which indicate that he poses a danger to the community.  This first factor

weighs heavily in favor of detention.

**B.     The Weight of the Evidence Against the Defendant**

The weight of the evidence against defendant is overwhelming and also strongly favors detention.  Nonetheless, defendant contends that he may have a defense that would undercut this evidence and even immunize his conduct from criminal liability.  Not so.

**1.     *Description of Overwhelming Evidence***

According to the government, "[d]ozens of videos and photographs exist to prove" not only the defendant's participation in the Capitol riot, but also the specific actions of which he is accused.  Gov't Mot. at 21.  As described more fully *supra* Part I.A, photos and video footage clearly show defendant in the front of the crowd, interfering with police barriers, confronting and threatening law enforcement, encouraging the crowd to "take" the Capitol, and leading the mob and his co-conspirators in efforts to keep the metal barriers in the Capitol tunnels from closing, including by using his axe handle.  In addition, the government has obtained records from Google showing that a Google account associated with defendant's cell phone number was connected to Google services in or around the Capitol on January 6, 2021.  Aff. ¶ 14.

**2.     *"Following Instructions" Defense Is Likely Inapplicable and Dangerous***

Defendant does not challenge this flood of evidence against him.  Rather, he asks the Court to adopt the mindset of a Proud Boy gang member in the months leading up to January 6, watching as his gang "gain[ed] entry into the Republican mainstream," with Proud Boy leader Enrique Tarrio earning a position in former President Trump's reelection campaign and the Trump campaign turning a blind eye to "the organized participation of Proud Boy rallies merging into Trump events."  Def.'s Mem. at 5 (internal quotation marks and citations omitted).  This expressed public support, according to defendant, culminated in President Trump telling the Proud Boys to "stand back and stand by," a phrase "they understood . . . as a call to arms and preparedness."  *Id.* (internal quotation marks and citations omitted).  He and his fellow Proud

Boys, along with many others, thus concluded that they "ha[d] the implicit approval of the state" and so "acted on January 6." *Id.* at 6. He further contends that when President Trump addressed the demonstrators on January 6, before they marched on the Capitol, and encouraged them to "stop the steal" (a reference to the constitutionally mandated ratification of the results of the 2020 Presidential Election), he "told the assembled rabble what they must do"—that is, prevent the certification of the electoral vote count—and "they followed his instructions." *Id.* at 10.

In light of this background for the events of January 6 and his own activities, defendant contends that the strength of the evidence against him is ephemeral since he "likely has a viable defense" to criminal liability under the Due Process Clause, *id.* at 7, because he believed that he "had an official endorsement" for his conduct on January 6, *id.* at 5. He argues, relying on a trilogy of Supreme Court cases, that "[a]cting at the behest or permission of federal official has long been recognized as a defense to criminal charges," *id.* at 7, because "[c]onvicting 'a citizen for exercising a privilege which the State had clearly told him was available to him' violates the Due Process Clause," *id.* at 11 (quoting *Cox v. Louisiana*, 379 U.S. 559, 571 (1965)). President Trump, in defendant's view, "gave that permission and privilege to the assembled mob on January 6," *id.*, and defendant therefore cannot be punished for acting in accord with the then–President's words.

This theory has not been fully briefed by the parties, and the question of former President Trump's responsibility, legal, moral, or otherwise, for the events of January 6, 2021 is not before this Court. Defendant presents this defense only for the limited purpose of counterbalancing the overwhelming weight of the evidence against him. Nonetheless, in order to measure properly defendant's potential privilege against liability against the government's proffer, some exploration of the proposed due process defense is necessary.

20

Defendant invokes a novel iteration of a complete defense to criminal liability that arises when an individual criminally prosecuted for an offense reasonably relied on statements made by a government official charged with "interpreting, administering, or enforcing the law defining the offense" and those statements actively misled the individual to believe that his or her conduct was legal. *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018) (internal quotation marks and citations omitted) (outlining the elements of the defense). "The defense . . . is based on fundamental fairness concerns of the Due Process Clause," *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996), and thus relies on an assessment of whether the challenged prosecution "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Patterson v. New York*, 432 U.S. 197, 202 (1977) (internal quotation marks and citation omitted), because of the lack of notice and fairness to the charged defendant. The Supreme Court recognized this defense, sometimes called "entrapment by estoppel," in three cases, *Raley v. Ohio*, 360 U.S. 423 (1959), *Cox v. Louisiana*, 379 U.S. 559 (1965), and *United States v. Pennsylvania Industrial Chemical Corp.* ("*PICCO*"), 411 U.S. 655 (1973). Examination of these decisions shows first, that entrapment by estoppel is a narrowly tailored defense, available in very limited circumstances, and second, that this defense does not excuse defendant's conduct in the instant case.

In *Raley*, the Supreme Court set aside the convictions under state law of three individuals who refused to answer the questions of the Ohio Un-American Activities Commission, in reliance on inaccurate representations by the Commission "that they had a right to rely on the privilege against self-incrimination" under the Ohio Constitution, a privilege that had been eliminated by statute in the context of proceedings before the Commission. 360 U.S. at 425; *see also id.* at 437. The Court found that conviction under such circumstances violated the Due

Process Clause of the Fourteenth Amendment because "to sustain [the convictions] . . . would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him." *Id.* at 438. In reaching this conclusion, the Court emphasized both that "the Chairman of the Commission, who clearly appeared to be the agent of the State in a position to give such assurances," *id.* at 437, gave the defendants the erroneous advice, and that the content of the advice constituted "active misleading," *id.* at 438.

      The Court applied this holding in *Cox* to reverse the conviction of a protester who had led a group of 2,000 in a civil rights march across the street from a courthouse and was later prosecuted for violating an anti-picketing statute. 379 U.S. at 564–65. The state statute in question prohibited demonstrations "'near'" a courthouse, without defining that term. *Id.* at 560 (quoting La. Rev. Stat. § 14:401 (Cum. Supp. 1962)). The protestors had been "affirmatively told" by "the highest police officials of the city, in the presence of the Sheriff and Mayor," that a protest across the street was lawful. *Id.* at 571. The Court determined that the inherent ambiguity in the term "near" necessarily "fores[aw] a degree of on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing it," and thus found that the demonstrators "would justifiably tend to rely on [the police's] administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id.* at 568–69. Analogizing to *Raley*, the Court concluded that "[t]he Due Process Clause does not permit convictions to be obtained under such circumstances." *Id.* at 571. The Court was careful, however, to cabin the reach of this emerging defense, noting that "this limited administrative regulation of traffic" did not "constitute a waiver of law . . . beyond the power of the police," and

distinguishing the facts of the case from a hypothetical situation in which an official might purport to "allow[] one to commit, for example, murder or robbery." *Id.* at 569.

Finally, the Court in *PICCO* recognized the availability of an entrapment by estoppel defense to a corporation that was convicted for violating a statute prohibiting the discharge of refuse into navigable waters, after acting in reliance on the Army Corps of Engineers' "longstanding, official administrative construction" of the term "navigable waters." 411 U.S. at 670; *see also id.* at 658–60, 672–75. Finding that the company "had a right to look to the Corps of Engineers' regulations for guidance" because "[t]he Corps [was] the responsible administrative agency under the [statute]," the Court concluded, "to the extent that the regulations deprived PICCO of fair warning as to what conduct the Government intended to make criminal, . . . there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution." *Id.* at 674. Thus, the corporation was entitled to present evidence in support of the defense at trial.

Together, this trilogy of cases gives rise to an entrapment by estoppel defense under the Due Process Clause. That defense, however, is far more restricted than the capacious interpretation suggested by defendant, that "[i]f a federal official directs or permits a citizen to perform an act, the federal government cannot punish that act under the Due Process Clause." Def.'s Mem. at 7. The few courts of appeals decisions to have addressed the reach of this trilogy of cases beyond their facts have distilled the limitations inherent in the facts of *Raley*, *Cox*, and *PICCO* into a fairly restrictive definition of the entrapment by estoppel defense that sets a high bar for defendants seeking to invoke it. Thus, "[t]o win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was

23

responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Cox*, 906 F.3d at 1191 (internal quotation marks and citations omitted).[8]

The Court need not dally over the particulars of the defense to observe that, as applied generally to charged offenses arising out of the January 6, 2021 assault on the Capitol, an entrapment by estoppel defense is likely to fail. Central to *Raley*, *Cox*, and *PICCO* is the fact that the government actors in question provided relatively narrow misstatements of the law that bore directly on a defendant's specific conduct. Each case involved either a misunderstanding of the controlling law or an effort by a government actor to answer to complex or ambiguous legal questions defining the scope of prohibited conduct under a given statute. Though the impact of the misrepresentations in these cases was ultimately to "forgive a breach of the criminal laws," *Cox*, 379 U.S. at 588 (Clark, J., concurring in part and dissenting in part), none of the statements made by these actors implicated the potential "waiver of law," or indeed, any intention to encourage the defendants to circumvent the law, that the *Cox* majority suggested would fall beyond the reach of the entrapment by estoppel defense, *id.* at 569. Moreover, in all three cases, the government actors' statements were made in the specific exercise of the powers lawfully

---

[8]        *See also, e.g., Garcia v. Does*, 779 F.3d 84, 95 (2d Cir. 2015) (en banc) (declining to extend the defense to a case that, like *Cox v. Louisiana*, involved the location and movements of protestors who argued that their prosecuted conduct had been implicitly approved by the police, but could not show that it was "affirmatively authorized by the police"); *United States v. Caron*, 64 F.3d 713, 716–17 (1st Cir. 1995) (refusing to extend *Raley* and *Cox* to cover representations made by government officials with respect to laws over which they lacked jurisdiction); *United States v. Tallmadge*, 829 F.2d 767, 774 (9th Cir. 1987) (noting that "to establish the defense . . . the defendant must establish 'that his reliance on the misleading information was reasonable—in the sense that a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries" (quoting *United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970))); *Dellums v. Powell*, 566 F.2d 167, 182–83 (D.C. Cir. 1977) (recognizing the defense only on facts substantially similar to those of *Cox v. Louisiana*).

entrusted to them, of examining witnesses at Commission hearings, monitoring the location of demonstrations, and issuing technical regulations under a particular statute, respectively.

In contrast, January 6 defendants asserting the entrapment by estoppel defense could not argue that they were at all uncertain as to whether their conduct ran afoul of the criminal law, given the obvious police barricades, police lines, and police orders restricting entry at the Capitol. Rather, they would contend, as defendant does here, that "[t]he former President gave th[e] permission and privilege to the assembled mob on January 6" to violate the law. Def.'s Mem. at 11. The defense would not be premised, as it was in *Raley*, *Cox*, and *PICCO*, on a defendant's confusion about the state of the law and a government official's clarifying, if inaccurate, representations. It would instead rely on the premise that a defendant, though aware that his intended conduct was illegal, acted under the belief President Trump had waived the entire corpus of criminal law as it applied to the mob.

Setting aside the question of whether such a belief was reasonable or rational, as the entrapment by estoppel defense requires, *Cox* unambiguously forecloses the availability of the defense in cases where a government actor's statements constitute "a waiver of law" beyond his or her lawful authority. 379 U.S. at 569. Defendant argues that former President Trump's position on January 6 as "[t]he American head of state" clothed his statements to the mob with authority. Def.'s Mem. at 11. No American President holds the power to sanction unlawful actions because this would make a farce of the rule of law. Just as the Supreme Court made clear in *Cox* that no Chief of Police could sanction "murder[] or robbery," 379 U.S. at 569, notwithstanding this position of authority, no President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters. Accepting that premise, even for the limited purpose of immunizing defendant and others

similarly situated from criminal liability, would require this Court to accept that the President

may prospectively shield whomever he pleases from prosecution simply by advising them that

their conduct is lawful, in dereliction of his constitutional obligation to "take Care that the Laws

be faithfully executed." U.S. Const. art. II, § 3. That proposition is beyond the constitutional

pale, and thus beyond the lawful powers of the President.

Even more troubling than the implication that the President can waive statutory law is the

suggestion that the President can sanction conduct that strikes at the very heart of the

Constitution and thus immunize from criminal liability those who seek to destabilize or even

topple the constitutional order. In addition to his obligation to faithfully execute the laws of the

United States, including the Constitution, the President takes an oath to "preserve, protect and

defend the Constitution." U.S. Const. art. II, § 1, cl. 8. He cannot, in keeping with his

constitutional function and his responsibilities under Article II, lawfully permit actions that

directly undermine the Constitution. Thus, a President cannot, within the confines of his

constitutional authority, prevent the constitutionally mandated certification of the results of a

Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on

the coequal Legislative branch of government. Were a President to attempt to condone such

conduct, he would act *ultra vires* and thus without the force of his constitutional authority. *See,*

*e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89, 614 (1952) (enjoining

actions taken by the President that exceeded his constitutional powers). Put simply, even if

former President Trump in fact, as defendant suggests, "told the assembled rabble what they

must do," (i.e., attack the Capitol and disrupt the certification of the electoral vote count) and

"ratified their actions," Def.'s Mem. at 10, he acted "beyond [his] power" as President, *Cox*, 379

U.S. at 569, and his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

The evident limitations on the entrapment by estoppel defense make highly unlikely that this defense will prevail or be "viable" and therefore does little to outweigh the overwhelming evidence against defendant proffered by the government for the purposes of assessment under § 3142(g)(2). The second statutory factor thus strongly favors detention.

### C.    The History and Characteristics of the Defendant

The third factor requires examination of defendant's history and characteristics and also weighs in favor of detention. Defendant has a very limited criminal history, if any. Gov't's Mot. at 21; *Chrestman*, 2021 WL 663189, at *7.[9] Moreover, he has fairly strong ties to the area in which he resides. As the Magistrate Judge who granted release noted, defendant has lived in the Kansas City, Kansas area for seventeen years, currently resides with his partner, and has relationships with his three children who live nearby, the youngest of whom lives with defendant part-time. *Chrestman*, 2021 WL 663189, at *7. Though defendant has been unemployed for nearly a year due to the COVID-19 pandemic, he was regularly employed as a sheet metal worker for fourteen years before losing work. *Id.*; Def.'s Mem. at 11 & Attach. 1. He is a veteran of the United States Army, and was honorably discharged. Def.'s Mem. at 11.

These factors are to defendant's credit, and indicate that he does not pose a flight risk, but his more recent behavior surrounding the events January 6 gives rise to significant concerns about the danger he may present to the community. As explained above, the extent of his involvement in the mob clearly poses a danger. In addition, in the nearly two months that have

---

[9]    The parties dispute whether defendant has a prior arrest for a firearms-related offense in the mid-1990s, Gov't's Mot. at 21; Hr'g Tr. (Rough) at 26:13-19, but the government does not contend that defendant has any criminal history beyond this possible arrest, Gov't's Mot. at 21.

passed since January 6, defendant has not exhibited any remorse for what occurred at the Capitol. Nothing in the record suggests that he has any remorse about the events of January 6 or disclaimed the beliefs and gang membership animating his actions on that day, and thus there is no evidentiary basis to assume that defendant will refrain from similar activities, if instructed, in the future.

Further, defendant's conduct upon his return to his home in Kansas after January 6 raises concern about whether he was trying to obstruct or conceal evidence. Defendant was aware by February 4, 2021, at the latest, after the *Kansas City Star* requested an interview about his role in the Capitol riot and published an article indicating that multiple sources had identified him to the FBI, that he was under investigation and might face charges. Def.'s Mem. at 1–2. As his counsel notes, defendant's first step was to contact an attorney, not to flee. *Id.* He did not evade arrest—the FBI found him at his home on February 11, 2021—but he also did not voluntarily surrender. Def.'s Mem. at 2.

Moreover, the government proffers that, when law enforcement searched defendant's home at the time of his arrest, a number of items that could, in combination with the extensive photo and video evidence, corroborate his role in the events of January 6, were missing. Officers did not find any camouflage clothing or any tactical gear, such as the black helmet marked with orange tape or the gas mask defendant was seen wearing at the Capitol. Gov't's Mot. at 17. They located his cell phone hidden in a dresser drawer in the bedroom of his six-year-old child. *Id.* Law enforcement recovered one handgun from a vehicle parked outside defendant's home, Hr'g Tr. (Rough) at 22:20-23:4, but did not find the rifle marked with the Proud Boys acronym or any other firearm, Gov't's Mot. at 17–18. In an interview with law enforcement, one of defendant's co-conspirators revealed that defendant gave that rifle, and other firearms, to the co-

conspirator for safekeeping upon their return to Kansas from Washington, D.C.  *Id*. at 18.  In other words, these firearms are not in law enforcement custody but in the keeping of defendant's friend and therefore retrievable.

Altogether, this collection of missing items gives rise to the inference that defendant may have tried to conceal or discard evidence while trying to stay a step ahead of the investigation against him, and may, if released, take further steps to impede the investigation.  In this regard, the government has raised concern that defendant "poses a risk to intimidate both known and unknown co-conspirators" if released pending trial "because others in his conspiracy have spoken with law enforcement about the defendant's actions and may wish to continue providing information to law enforcement."  Gov't Mot. at 23.  In the government's view, the evidence so far "points to [defendant] being . . . the primary player in this conspiracy," Hr'g Tr. (Rough) at 16:10-12, and the government therefore fears that, if defendant believes co-conspirators' "continued discussion[s] with law enforcement . . . [will] further incriminate[]" him, he may seek to interfere with their cooperation, *id.* at 16:12-14.

In short, the fact that defendant did not flee or evade arrest does little to mitigate the heavy weight of the other factors favoring detention, given the clear danger he poses to the community and the fact that he engaged in conduct after January 6, 2021 that may have resulted in missing or obstructed evidence.

### D.    The Nature and Seriousness of the Danger Posed by Defendant's Release

The fourth factor, the nature and seriousness of the danger to the community posed by the defendant's release, also weighs heavily in favor of detention.  In reaching this conclusion, the same considerations that inform analysis of the nature and circumstances of charged offenses stemming from the January 6 assault on the Capitol, described *supra* Part III.A.1, are probative. Those considerations identify offense characteristics that indicate a defendant's conduct was

premeditated or deliberate, encouraged others to break the law or facilitated their misconduct, or featured particularly egregious behavior. Such elements, because they reflect the depth of a defendant's disregard for the safety of others, for our democratic institutions, and for the rule of law, necessarily reflect the significance of the immediate threat a defendant presents to the community in which he resides and the threat posed by his disrespect for the U.S. Constitution and official directives to the nation as a whole.

As set forth *supra* Part I.A and Part III.A.2, defendant's conduct on January 6, 2021 showed a clear disregard for the safety of others. He not only violated the law himself, but encouraged others to engage in unlawful conduct and made it easier for them to do so by obstructing police barriers, all the while shouting threats at Capitol Police and leading others in what he described as an effort to "take" the Capitol. Defendant's participation and de facto leadership role—including as the ringleader of an alleged conspiracy—in the assault on the Capitol, his use of an axe handle as an offensive weapon on that day, and his brazen actions when confronting and impeding law enforcement on Capitol grounds and inside the Capitol itself all support the conclusion that he poses a danger to the community.

Most critically, defendant's pre-planning and coordination with other rioters before, during, and after the riot raises grave concerns. This defendant traveled to the nation's capital equipped with tactical gear in preparation for conflict with law enforcement, including a helmet and gas mask for defensive use and an axe handle for offensive use. He coordinated with members of the Proud Boys and others to come to Washington, D.C., to march on the Capitol, and to impede law enforcement at every turn once on the Capitol grounds. Nearly as significant is defendant's use of force to advance towards the Capitol and his use of words to lead and guide the mob in obstructing the police and pushing against police barriers and to threaten officers

while brandishing a wooden club. All of this conduct was undertaken with total disregard for the law and for official directives. Defendant's actions meaningfully contributed to the successful disruption of the democratic process for hours while terrorizing elected officials, staff, and members of the press who sheltered inside the Capitol. In the several weeks that have passed since January 6, 2021, defendant has not disclaimed either the Proud Boys with whom he planned and executed these offenses or the conduct itself. He therefore remains a danger to the community in which he resides, if not to the broader community of American citizens.

Just as importantly, the record supports the finding that no condition or combination of conditions will assure this defendant's compliance with any release conditions. The conditions of home incarceration with electronic monitoring crafted by the Magistrate Judge in Kansas were intended to restrict this defendant to his home and thereby to contain any threat he might pose to the community or to the integrity of the investigation against him, *see Chrestman*, 2021 WL 663189, at *8–9, but all of the pre-planning, coordination, and obstructive conduct alleged by the government took place while defendant was at his home. He was at his home when he made arrangements to travel to D.C. with his fellow Proud Boys. He was at his home when he obtained the tactical gear and weapons seen in photo and video evidence, and he was at his home when those same items vanished after January 6. Further, his very actions on January 6 make apparent that that this defendant will follow his beliefs and his fellow gang members, even when the laws designed to protect our democracy prohibit his conduct. Together, these factors demonstrate that he cannot be trusted to abide by any conditions of release that might be imposed instead of pretrial detention.

In sum, this Court respectfully disagrees with the opinion of the Magistrate Judge that "[t]his case presents a very close call." *Chrestman*, 2021 WL 663189, at *8. Defendant's

31

conduct on January 6 and blatant disregard for the law clearly show that he is a serious danger to the community and the nation, and that no condition or combination of conditions can be imposed that will ensure his compliance with the law pending trial in this matter.

## IV.     CONCLUSION

Upon consideration of the Complaint, the government's Motion for Review of Release Order, the evidence proffered and arguments presented in connection with the government's motion, including at the detention hearing held on February 23, 2021, the entire record, and the factors set forth in 18 U.S.C. § 3142(g), the Court finds that all four statutory factors weigh heavily in favor of pretrial detention.  The government has thus met its burden of establishing, by clear and convincing evidence, that no condition or combination of conditions can be imposed that would reasonably ensure the safety of the community were he to be released pending trial. 18 U.S.C. § 3142(e)(1), (f)(2).  Accordingly, the government's Motion for Review of Release is granted and defendant shall remain in the custody of the Attorney General for confinement pending a final disposition in this case.  *See* 18 U.S.C. § 3142(i).

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  February 26, 2021

                                                                    _____
                                                                    BERYL A. HOWELL
                                                                    Chief Judge